NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **DENISE CHADWICK,** <br><br> Plaintiff, <br><br> v. <br><br> **ST. JAMES SMOKEHOUSE, INC.,** *et al.*, <br><br> Defendants. | Docket No.: 14-2708-WJM-MF <br><br> **OPINION** |

### WILLIAM J. MARTINI, U.S.D.J.

This is a retaliatory discharge case with two counts: 1.) CEPA violation; and 2.) wrongful discharge. Jurisdiction is based upon diversity. 28 U.S.C. § 1332.

Defendants St. James Smokehouse, Inc. ("St. James") and Brendan Maher ("Maher") filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), and for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court has considered the papers filed by the parties. There was no oral argument. L. Civ. R. 78.1(b). For the reasons that follow, the motion to dismiss is denied.

### I. BACKGROUND

Defendant St. James is a manufacturer of smoked salmon products that maintains operations in Miami, Florida and Annan, Scotland. Complaint ("Compl.") at ¶ 5. The company's principal place of business is located in Miami, Florida. Compl. at ¶ 5.

Defendant Brendan Maher is the owner and President of St. James

1

Smokehouse. Compl. at ¶¶ 6, 12. Maher is a resident of Florida. Maher Affidavit, ¶ 3.

On or about August 8, 2012, Maher hired Chadwick to be the principal buyer for St. James. Compl. at ¶ 12. Chadwick worked from her home in New Jersey. Compl. at ¶ 13. Chadwick's primary job responsibilities involved "negotiating the purchase of large quantities of whole salmon filets from wholesale distributors in Europe and South America." Compl. at ¶ 13.  Once the salmon was processed and smoked, it would be packaged for sale to wholesale or retail distributors throughout the United States, including to large retailers such as Whole Foods and Wegman's. Compl. at ¶ 15.

Chadwick alleges that she came under increasing pressure from Defendants to purchase cheaper Chilean salmon instead of Scottish salmon. Compl. at ¶ 19. Chadwick noticed that St. James sent the cheaper Chilean salmon to smoke houses in Miami and Scotland and then packaged and sold them as more expensive Scottish salmon. Compl. at ¶ 20. Chadwick also learned that invoices and product packaging misrepresented that St. James's smoked salmon product was from Scotland. Compl. at ¶¶ 26, 27. Chadwick further discovered that St. James used a smoke house in Florida that was owned by another company, MKG. Compl. at ¶ 21. The Complaint alleges that Chadwick was repeatedly instructed not to disclose that St. James used MKG because Maher "wanted to maintain the company's image and reputation as producing only the finest 'Scottish' salmon products." Compl. at ¶ 21. The Complaint further alleges that the Defendants' company website publicized false statements about the salmon including "[r]eassuringly Scottish" and "hand-picked fresh from the water" when, at times, Chadwick was required to buy bulk frozen salmon from Chile. Compl. at ¶¶ 22-24. Chadwick copied Maher on the email confirmations of these bulk purchases. Compl. at ¶ 25.

Chadwick allegedly complained to and warned Maher that he was violating FDA regulation. Compl. at ¶ 31.  On March 11, 2014, Chadwick sent Maher an email expressing her concerns over company practices she believed were "prosecutable offenses" in violation of federal law and FDA regulations relating to the importing of fresh seafood. Compl. at ¶ 32. The following morning, on March 12, 2014, Maher telephoned Chadwick and fired her. Compl. at ¶ 33.

## II.   MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of a complaint for lack of subject matter jurisdiction. Defendants argue that Plaintiff's Complaint should be dismissed for lack of subject matter jurisdiction, specifically Plaintiff's failure to state the requisite amount in dispute. The argument is not persuasive.

"The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States." 28 U.S.C. § 1332. It is not disputed that the parties are citizens of different states: Plaintiff is a citizen of New Jersey, and Defendants are citizens of Florida.

"The test for determining the amount in controversy in diversity cases was established by the Supreme Court in *St. Paul Mercury Indemnity Co. v. Red Cab. Co.*, 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938)." *Columbia Gas Transmission Corp. v. Tarbuck*, 62 F.3d 538, 541 (3d Cir. 1995).

> The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. *It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.* The inability of plaintiff to recover an amount adequate to give the court jurisdiction does not show his bad faith or oust the jurisdiction. . . . But if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed, or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore colorable for the purpose of conferring jurisdiction, the suit will be dismissed.

3

*Id.* (citing *Red Cab*, 303 U.S. at 288-89; *Jones v. Knox Exploration Corp.*, 2 F.3d 181 (6th Cir. 1993); *Ehrenfeld v. Webber*, 499 F. Supp. 1283, 1294 (D. Me. 1980)).

While the amount in controversy is not expressly stated in the Complaint, the Plaintiff alleges that her annual compensation at the time of discharge was approximately $132,000 per year. Pl. Opp. Br. 19. It therefore does not appear to a legal certainty that Plaintiff's claim is for less than the jurisdictional amount. In sum, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(3) because the amount in controversy exceeds $75,000, and the case is between citizens of different states.

## III. MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Defendants argue that Plaintiff's Complaint should be dismissed for lack of personal jurisdiction over St. James and Maher. The argument is not persuasive.

### A. Legal Standard

Federal Rule of Civil Procedure 12(b)(2) provides for the dismissal of a complaint for lack of personal jurisdiction. "[T]o exercise personal jurisdiction over a defendant, a federal court sitting in diversity must undertake a two-step inquiry." *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 258-59 (3d Cir. 1998). First, the court applies the relevant long-arm statute of the forum state to determine if it permits the exercise of jurisdiction. *Id.* at 259. Second, the court applies the principles of the Due Process Clause of the Constitution. *Id.* In New Jersey, this inquiry is collapsed into a single step because the New Jersey long-arm statute permits the exercise of personal jurisdiction to the fullest limits of due process. *See* N.J. Court. R. 4:4-4(c); *DeJames v. Magnificence Carriers, Inc.*, 654 F.2d 280, 284 (3d Cir. 1981). Personal jurisdiction under the Due Process Clause requires a plaintiff to show that the defendant has purposefully directed its activities toward the residents of the forum state, or otherwise "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

"The due process limit to the exercise of personal jurisdiction is defined by a two-prong test. First, the defendant must have made constitutionally sufficient 'minimum contacts' with the forum." *Vetrotex Certainteed Corp. v.*

*Consol. Fiber Glass Products Co.*, 75 F.3d 147, 150 (3d Cir. 1996) (*citing Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474 (1985)). "Second, if 'minimum contacts' are shown, jurisdiction may be exercised where the court determines, in its discretion, that to do so would comport with 'traditional notions of fair play and substantial justice.'" *Id.* at 150-51 (*citing International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

"Minimum contacts" over a non-resident defendant can be established in one of two ways: general jurisdiction or specific jurisdiction. *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 334 (3d Cir. 2009). General jurisdiction exists where the non-resident defendant has general contacts with the forum state that are "continuous and systematic." *Arlington Indus., Inc. v. Elec. Custom Distributors, Inc.*, 817 F. Supp. 2d 473, 477 (M.D. Pa. 2011) (*citing Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-166 (1984)). General jurisdiction allows a court to hear any and all claims against a party, even where the cause of action is unrelated to the forum. *Id.* at 477. Contacts with a forum are "continuous and systematic" where the Defendant is "essentially at home in the forum state." *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (U.S. 2014).

Specific jurisdiction is established when a non-resident defendant has "purposefully directed" his activities at a resident of the forum, and the injury arises from or is related to those activities. *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001) (*citing Burger King*, 471 U.S. at 472). Analysis for specific jurisdiction is a three-part inquiry. *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007). First, the defendant must have "'purposefully directed' his activities" at the forum. *Id.* (*citing Burger King*, 471 U.S. at 472). The existence of the first element will vary with the "quality and nature of the defendant's activity," but there must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Second, the plaintiff's claim must "arise out of or relate to" at least one of those specific activities. *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d at 317 (*citing Helicopteros*, 466 U.S. at 414). Third, if the prior two requirements are met, courts may consider additional factors to ensure that the assertion of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'" *Id.* (*citing Burger King,* 471 U.S. at 476).

### B. Burden of Proof

"The plaintiff bears the burden to prove, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction." *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 146 (3d Cir. 1992). There are three methods for assessing whether a plaintiff has proven personal jurisdiction. *In re Diet Drugs (Phentermine/ Fenfluramine/Dexfenfluramine) Products Liab. Litig.*, MDL 1203, 2010 WL 2264869, at * 2 n. 6 (E.D. Pa. June 4, 2010) (*citing Boit v. Gar–Tec Products, Inc.*, 967 F.2d 671, 675-76 (1st Cir. 1992)). Under "the prima facie method," which is the only test that can be used prior to an evidentiary hearing, we consider "only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." *In re Diet Drugs*, 2010 WL 2264869, at * 2*; Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 331 (3d Cir. 2009). Upon an attack on personal jurisdiction, the Court must accept as true the allegations in the complaint, and resolve disputed issues of fact in favor of the plaintiff. *Carteret Savs. Bank v. Shushan*, 954 F.2d 141, 142 n. 1 (3d Cir. 1992).

### C. Minimum Contacts Analysis

Plaintiff has established that Defendants have minimum contacts with New Jersey. Without ruling on the merits of general jurisdiction, the Court finds that it has specific jurisdiction over both Defendants. The parties do not dispute that the cause of action arises from a contact with the forum state and only argue that the Defendants failed to demonstrate that they "purposefully directed" their activities to New Jersey or "purposefully availed" of the forum. Defendants have many contacts with New Jersey demonstrating that they have purposefully availed themselves of the privileges of doing business there, and the instant case arises out of one of those contacts.

St. James has on numerous occasions, done business with the following New Jersey businesses:

- Cold Spring Fish and Supply (Cape May, New Jersey)
- Madison Seafood, Inc. (Newark, New Jersey)
- P&G Trading Co Inc. (Trenton, New Jersey)
- Metropolitan Seafood NJ (Lebanon, New Jersey)
- Wegman's (seven locations in New Jersey)
- Whole Foods (twelve locations in New Jersey)

ECF No. 14-1. Maher even admits that he once had to appear in a small claims proceeding in New Jersey on behalf of St. James in order to resolve an

unpaid debt with a New Jersey customer.  Maher Affidavit, ¶5.

Most critically, Defendants "purposefully availed" themselves of the New Jersey forum when they hired Plaintiff to be St. James's principal buyer and continuously relied on Plaintiff to perform essential functions of its business from a remote office located in New Jersey.  In the course of their dealings with Plaintiff, St. James and Maher offered to purchase and ship St. James's office equipment to Plaintiff in New Jersey, and they engaged in continuous business phone and email interactions with Plaintiff for almost two years.  Moreover, Maher made the phone call to the forum state to terminate Plaintiff.

Defendants contend that they did not avail themselves of the New Jersey forum because they hired and fired Plaintiff from Florida. Def. Br. 9. However, the focus of purposeful availment is not on the location of the defendant but where the defendant directs its activities. *See Marten v. Godwin*, 499 F.3d 290, 298 (3d Cir. 2007) ("Jurisdiction is proper when the state of a plaintiff's residence is the focus of the activities of the defendant out of which the suit arises.") (internal quotations omitted).

"The "purposeful availment" requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another person.'" *Am. Tel. & Tel. Co. v. MCI Commc'ns Corp.*, 736 F. Supp. 1294, 1302-03 (D.N.J. 1990) (*quoting Burger King Corp.,* 471 U.S. at 475); *see also Hanson v. Denckla,* 357 U.S. 235, 253 (1958) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State."). Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a "substantial connection" with the forum state. *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957) (internal citations omitted). Moreover, the United States Supreme Court provided:

> Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State

7

>in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (internal citations omitted).

Here, the contacts could not be classified as "random," "isolated," or "fortuitous." Defendants created a "substantial nexus" with New Jersey by placing a key piece of their business in New Jersey and engaging in continuous phone and e-mail exchanges with her for the purposes of conducting that business. *See McGee*, 355 U.S. at 223. That the Defendants were physically located in Florida the entire time is not dispositive. Their acts, particularly the crucial act of firing Chadwick, were "purposefully directed" towards Plaintiff in New Jersey.

### D. Fair Play and Substantial Justice Analysis

Exerting personal jurisdiction over Defendants also comports with "traditional notions of fair play and substantial justice." *International Shoe*, 326 U.S. at 324. "The Supreme Court of the United States has set forth a variety of relevant factors to the 'fair play and substantial justice' inquiry including 'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute' and 'plaintiff's interest in obtaining convenient and effective relief.'" *Sonic Supply, LLC v. Universal White Cement Co.*, 2008 WL 2938051, at *3 (D.N.J. July 29, 2008) (*citing Burger King*, 471 U.S. at 476). The defendant bears a high burden in convincing the court that the exercise of jurisdiction would be unreasonable. *See Burger King Corp.,* 471 U.S. at 477 (stating that defendant must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."); *Asahi Metal Indus. Co. v. Superior Court of California, Solano Cnty.*, 480 U.S. 102, 116 (1987) (noting that it is only in "rare cases" that the "minimum requirements inherent in the concept of fair play and substantial justice defeat the reasonableness of jurisdiction even though the defendant has purposefully engaged in forum activities."). Defendants have not met the high burden of demonstrating that jurisdiction is unreasonable.

In this case, Defendants are both citizens of Florida. Thus, Florida is a more convenient forum for Defendants than New Jersey. However, New Jersey has a strong interest in protecting its residents from retaliatory actions.

*See Abbamont v. Piscataway Twp. Bd. of Educ.*, 138 N.J. 405, 418 (1994) (emphasizing how CEPA "seeks to overcome the victimization of employees and to protect those who are especially vulnerable in the workplace from the improper or unlawful exercise of authority by employers"). This need for protection is all the more true for New Jersey citizens working remotely for out-of-state employers. *See Rogers v. Kasahara*, 2006 WL 6312904, at *1, 5 (D.N.J. Oct. 16, 2006) (finding specific jurisdiction over Japanese defendants who hired a New Jersey resident to head operations in the United States and Canada when defendants allegedly controlled resident's employment and terminated him after he complained of defendants' asserted illegal activities). In this case, New Jersey also had an interest in protecting its consumers from the allegedly mislabeled fish that St. James sold in New Jersey.

Moreover, Defendants received continual benefits from this forum through Plaintiff's substantial work as chief buyer for the company. As the chief buyer for the company, she was a major hub of St. James's entire business operations, and she was located in New Jersey.

### E. Corporate Shield Doctrine

Maher contends that New Jersey cannot exercise personal jurisdiction over him because "the only transactions Mr. Maher is alleged to have conducted in the forum are those in which he was acting as an officer of St. James." Def. Br. 7. In making this contention, Maher invokes the so-called "corporate shield" doctrine[1], which sometimes protects defendants who are sued in their individual capacities for their acts as corporate officers. *Cerciello v. Canale*, 563 F. App'x 924, 927-28 (3d Cir. 2014); *Sharp Electronics Corp. v. Hayman Cash Register Co.*, 1982 WL 1860, at *1 (D.N.J. May 20, 1982). This doctrine places due process limits on the exercise of personal jurisdiction over an employee acting in a fiduciary capacity for an employer's benefit. *Sharp Electronics*, 1982 WL 1860, at *1. "[P]ersonal jurisdiction based on an officer or director's corporate activities would in effect render corporate officers or directors subject to suit in any state in which their corporation does business and would violate the concept of fundamental fairness which undergirds constitutional due process." *Simkins Corp. v. Gourmet Res. Int'l*, 601 F. Supp. 1336, 1344-45 (E.D. Pa. 1985).

---

[1] This doctrine is sometimes called the "fiduciary shield doctrine." *Cerciello v. Canale*, 563 F. App'x at 927 n. 8.

9

Defendants' briefing suggests that the corporate shield doctrine's protections from jurisdiction are coextensive with the corporate form's protections from liability. Def. Br. 5. ("It is well-settled law that individual defendants who are officers or directors of a corporation are not subject to the personal jurisdiction of any particular state by virtue of actions or business they conduct on behalf of the corporations for which they serve."). No case law supports that proposition. On the contrary, in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n. 13 (1984), the Supreme Court wrote, "[W]e . . . reject the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity. But jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him." (*citing Calder v. Jones*, 465 U.S. 783, 790 (1984)). Rather, each defendant's contacts with the forum state "must be assessed individually." *Calder v. Jones*, 465 U.S. 783, 790 (1984).

The facts of this case are indistinguishable from those of *Calder v. Jones*. In *Calder*, the plaintiff, a California resident, sued two employees of the *National Enquirer* in a California court for a libelous article. It was not disputed that the *National Enquirer* had minimum contacts with California, but the employees, the article's author and the magazine's editor/president, argued that jurisdiction did not extend to them because they had never gone to California for the purposes of producing the article. The Court found that personal jurisdiction did extend over the employees on the basis that they were the "primary participants in an alleged wrongdoing intentionally directed at a California resident." 465 U.S. at 790. In other words, the fact that they acted on behalf of a corporation did not insulate them from jurisdiction. Rather, the Court found that they could "reasonably anticipate being haled into court" in California to "answer for the truth of the statements made in their article." *Id.* at 790 (*citing World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. at 297).

Maher has greater contacts with New Jersey than either of the two *Calder* defendants had with California. In *Calder*, the author's contacts were based upon telephone calls he had in Florida with sources in California, and the editor/president's contacts came from the fact that he oversaw "just about every function of the *Enquirer*." *Id.* at 785-86. In this case, Maher was both the immediate instrumentality of all the alleged wrongs as well as the "key player" in St. James's corporate structure. *See Medelsohn, Drucker & Associates v. Titan Atlas Mfg., Inc.*, 885 F. Supp. 2d 767, 784 (E.D. Pa. 2012) (noting that the corporate shield will frequently not protect an individual who is a "key player in the corporate structure."). Maher purposefully directed his

activities into New Jersey by personally hiring Chadwick, ordering her to purchase cheaper fish, and then firing her when she objected to the mislabeling. Maher's alleged act of illegal retaliation was directed at a New Jersey resident, and "he knew that the brunt of that injury would be felt by [the plaintiff] in the State in which she lives and works." *Calder*, 465 U.S. at 789-90. Maher was also the owner and president of St. James, not just a mere employee. For these reasons, Maher could "reasonably anticipate being haled into court" in New Jersey to answer for the alleged retaliation that violated New Jersey law. *See Calder*, 465 U.S. at 790.

## IV.   MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Plaintiff pleads sufficient facts to state a claim for both a CEPA violation (Count 1) and wrongful discharge (Count 2). Accordingly, Defendants' motion to dismiss for failure to state a claim is denied.

### A.   Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted.  The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).  In deciding a motion to dismiss under Rule 12(b)(6), a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff.  *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998) (*citing Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008).  "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 663-64 (2009).  A claim has "facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.* at 678.

### B. Motion to Dismiss CEPA Claim (COUNT 1)

#### 1. Legal Standard

The New Jersey Conscientious Employee Protection Act ("CEPA") is a whistleblower statute that prohibits employers from taking retaliatory action against certain employees. *Stapleton v. DSW, Inc.*, 931 F. Supp. 2d 635, 638 (D.N.J. 2013) (*citing* N.J.S.A. 34:19–3). "Its purpose is to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." *Abbamont v. Piscataway Township Bd. of Educ.*, 138 N.J. 405, 431 (1994). In order to maintain a cause of action under CEPA, a plaintiff must show: (1) that he or she reasonably believed that his or her employer's conduct was violating a law, rule, or regulation or a clear mandate of public policy concerning the public health or safety; (2) that he or she performed a whistle-blowing activity described in N.J.S.A. 34:19–3; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistleblowing activity and the adverse employment action. *Dzwonar v. McDevitt*, 177 N.J. 451, 462 (2003). Whistle-blowing activities include refusing to engage in illegal activities and practices or objecting to them. N.J.S.A. 34:19–3.

#### 2. Analysis

Defendants argue that Plaintiff has not set forth sufficient facts to demonstrate that she is an "employee" of Defendant St. James eligible for CEPA protection. *See* Def. Br. 14. The argument is not persuasive.

In *D'Annunzio v. Prudential Ins. Co. of Am.*, 192 N.J. 110, 119-21 (2007), the New Jersey Supreme Court discusses the test for establishing an employee relationship in the context of CEPA. CEPA defines "employee" as "any individual who performs services for and under the control and direction of an employer for wages or other remuneration." N.J.S.A. 34:19–2(b). The definition "includes more than the narrow band of traditional employees."

12

*D'Annunzio*, 192 N.J. at 121. In fact, the Court noted, "the definition does not exclude, explicitly, persons who are designated as independent contractors performing services for an employer for remuneration." *Id.*

The *D'Annunzio* Court cites twelve factors to be considered when determining whether a plaintiff qualifies as an employee: (1) the employer's right to control the means and manner of the worker's performance; (2) the kind of occupation—supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the business of the "employer;" (10) whether the worker accrues retirement benefits; (11) whether the "employer" pays social security taxes; and (12) the intention of the parties. *Id.* at 123 (*citing Pukowsky v. Caruso*, 312 N.J. Super. 171, 182-83 (App. Div. 1998)). The Supreme Court of New Jersey went on to emphasize three factors most pertinent when CEPA or other social legislation is invoked by a person "providing specialized services allegedly as an independent contractor [.]" *Id.* at 122. Those factors are: "(1) employer control; (2) the worker's economic dependence on the work relationship; and (3) the degree to which there has been a functional integration of the employer's business with that of the person doing the work at issue." *Id.*

Furthermore, a judicious application of CEPA's definition of "employee" should "include adjustment for the modern reality of a business world in which professionals and other workers perform regular or recurrent tasks that further the business interests of the employer's enterprise, notwithstanding that they may receive remuneration through contracts instead of through the provision of wages and benefits." *Id.* at 124. CEPA is ultimately "remedial legislation" meant to be construed "liberally to effectuate its important social goal." *Abbamont v. Piscataway Township Bd. of Educ.*, 138 N.J. 405, 431 (1994). Therefore, in order for CEPA to achieve its remedial promise, the test for an "employee" under CEPA's coverage "must adjust to the specialized and non-traditional worker who is nonetheless integral to the business interests of the employer." *D'Annunzio*, 192 N.J. at 124-25 (2007).

For example, in *D'Annunzio*, the Court found that the plaintiff had provided enough facts to show that he was an employee despite being designated an independent contractor in his agreement with his employer. *Id.* at 127. In that case, Prudential Property and Casualty Insurance Company

hired plaintiff as a chiropractic medical director in its Personal Injury Protection Department. *Id.* at 115. The Court found that he was under the control of Prudential and served as a "veritable 'cog'" in his department's operations. *Id.* at 126. Plaintiff performed in accordance with protocols devised by Prudential to meet their business plan and in furtherance of Prudential's operation. *Id.*

Here, both the Defendants and Plaintiff allege that Plaintiff is an "independent contractor" and not an "employee." *See* Def. Br. 14; Pl. Opp. Br. 4. However, it would be conclusory to determine that Plaintiff is not an "employee" for the purposes of CEPA on that basis alone. The Court "must look to the goals underlying CEPA and focus not on labels but on the reality of plaintiff's relationship with the party against whom the CEPA claim is advanced" when construing the term "employee." *Feldman v. Hunterdon Radiological Assocs.*, 187 N.J. 228, 241 (2006) (interpreting the term "employee" for CEPA purposes).

Defendants argue that Plaintiff was "hired as an independent contractor to work unsupervised and uncontrolled at her discretion with no sales quotas or goals, using her own equipment, with no set vacation, personal, or sick leave, and no insurance or retirement benefits." Def. Br. 14-15; *see also* St. James Affidavit, ¶¶ 6, 16, 17, 18, 21, 23. However, the Court finds that Plaintiff has pled sufficient facts to show employer control. Plaintiff was hired by Defendant Maher in August 2012 to be the principal buyer for his fish company. *See* Compl. at ¶ 12; Maher Affidavit, ¶ 6. Plaintiff alleges that as chief buyer she came under increasing pressure from Defendants to purchase cheaper salmon from Chile rather than the more expensive Scottish salmon. Compl. at ¶ 19. Plaintiff also alleges that Defendants directed her to buy "bulk frozen salmon," from Chile as this fish was cheaper for St. James to purchase than fresh fish. Compl. at ¶¶ 23-24. Moreover, Plaintiff relied on St. James's email address, computer, and printer in performing her work. *See* Pl. Sur-Reply Br. 1; Maher Affidavit, ¶ 18.

Plaintiff has also pled sufficient facts to show a functional integration of St. James's business with Plaintiff's work as principal buyer for the company. Plaintiff's responsibilities included negotiating the purchase of substantial amounts of whole salmon filets from wholesale distributors throughout the continents of Europe and South America. Compl. at ¶13. Like the plaintiff in *D'Annunzio*, Ms. Chadwick was a "veritable cog" in St James' operations. Though Plaintiff worked from home in New Jersey, and her communications with St. James were primarily through email and telephone,

14

all of Plaintiff's transactions were in furtherance of St. James's operation. She performed accordingly as evidenced by her continued employment with St. James as head buyer for almost two years. *See* Compl. at ¶ 33. As such, Plaintiff has performed regular and recurrent tasks that furthered the interests of St. James's enterprise.

Relying on CEPA's construction as liberal remedial legislation and the twelve *D'Annunzio* factors, the Court finds that Plaintiff has pled sufficient facts to show that she is an employee eligible for CEPA protection. Therefore, Defendants' motion to dismiss Count I (CEPA) is denied.

### C.     Motion to Dismiss Wrongful Discharge Claim (COUNT 2)

Plaintiff brings a common law *Pierce* claim for wrongful discharge. Plaintiff alleges that she was wrongfully terminated after she objected to Defendants' practices she believed to be illegal and fraudulent. *See* Compl. at ¶¶ 39-42.

In *Pierce v. Ortho Pharm. Corp.*, the New Jersey Supreme Court held "that an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." *Pierce v. Ortho Pharm. Corp.*, 84 N.J. 58, 72 (1980). Declarations of such public policy can be found in legislation, administrative rules and regulations, and judicial decisions. *Id.* A wrongfully discharged employee can maintain an action in contract or in tort or both. *Id.* For example, a tort action may be based on the "duty of an employer not to discharge an employee who refused to perform an act that is a violation of a clear mandate of public policy." *Id.*

Defendants make two arguments for dismissal of Plaintiff's wrongful discharge claim: 1.) the filing of a CEPA claim waives all rights to a wrongful discharge claim; 2.) Plaintiff is not an "employee" for the purposes of a wrongful discharge claim.  Neither argument is persuasive.

#### 1. CEPA Waiver

The parties do not dispute that "the *institution* of a [CEPA action] shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law." *Young v. Schering Corp.*, 141 N.J. 16, 24 (1995)

15

(*quoting* N.J.S.A. § 34:19–8). They dispute whether there has been an "institution" of the CEPA action sufficient to trigger the waiver.

The New Jersey Supreme Court has given no definitive interpretation of the point at which the waiver takes effect. *See Broad v. Home Depot U.S.A., Inc.*, 16 F. Supp. 3d 413, 417 (D.N.J. 2014). Therefore, it is this Court's duty to look at the relevant state court decisions to predict how the New Jersey Supreme Court "would decide the question of when CEPA requires a plaintiff to elect his remedy for retaliatory conduct by an employer." *Broad*, 16 F. Supp. 3d at 417 (*citing Werwinski v. Ford Motor Co.,* 286 F.3d 661, 670-71 (3d Cir. 2002)).

While explicitly declining to rule on the issue, the New Jersey Supreme Court indicated in the dicta of *Young v. Schering Corp.* that "institution of the action" could mean "something other than the filing of a complaint." 141 N.J. 16, 32 (1995). In *Young*, the Court stated that the meaning of "institution of an action" could "conceivably contemplate an election of remedies with restrictions in which the election is not considered to have been made until discovery is complete . . . ." *Id.* Several years later, the New Jersey Appellate Division, relying on the *Young* dicta, held in *Maw v. Advanced Clinical Comms.* that "before electing remedies, a plaintiff should have an opportunity to complete discovery." 359 N.J. Super. 420, 441, (App. Div. 2003), *rev'd on other grounds by* 179 N.J. 439 (2004).[2] "Only after gaining access to all of the facts will a plaintiff be in a position to make a knowing and meaningful election." *Id.*

Based on *Young* and *Maw*, the Court finds that the New Jersey Supreme Court would hold that CEPA waiver does not bar a plaintiff from filing a Complaint alleging both CEPA and common law wrongful discharge causes of action. A decision about CEPA waiver ought to be reached after discovery. *See Broad v. Home Depot U.S.A., Inc.*, 16 F. Supp. 3d 413 (D.N.J. 2014) (holding the same).

### 2. Plaintiff's Status as "Employee"

---

[2] It is important to note that the Supreme Court subsequently reversed the Appellate Division's decision because the wrongful discharge claim had been inadequately pled and not because the Appellate Division incorrectly analyzed the CEPA waiver provision. *Broad v. Home Depot U.S.A., Inc.*, 16 F. Supp. 3d 413, 418 (D.N.J. 2014) (*citing Maw v. Advanced Clinical Comms.*, 179 N.J. 439, 445–46 (2004)).

Independent contractors are not eligible to pursue a wrongful discharge cause of action. *See MacDougall v. Weichert*, 144 N.J. 380, 388 (1996). However, an individual may qualify as an independent contractor for some purposes but an employee for other purposes. *Id.*

A cause of action for wrongful discharge "is grounded in public policy and is designed to protect employees when failing to do so would violate a clear mandate of public policy." *Id.* (*citing Pierce v. Ortho Pharm. Corp.*, 84 N.J. 58, 72 (1980)). The wrongful discharge doctrine "grew out of a need to protect at-will employees, who are under the total control of the employer and without separate or independent contractual rights that provide employment protections." *Id.* (*citing Pierce*, 84 N.J. at 65-67).

In *MacDougall,* the New Jersey Supreme Court emphasized that "[t]he categorization of a working relationship depends not on the nominal label adopted by the parties, but rather on its salient features and the specific context in which the rights and duties that inhere in the relationship are ultimately determined." *Id.* Ultimately, the Court considers the employer's control over the individual, the individual's dependence on the employer, and the absence of any employment protection in determining whether the individual is an employee or an independent contractor for purposes of invoking a cause of action based on wrongful discharge. *See id.* at 389 ("The critical issue is whether the elements of control and dependence coupled with the absence of any employment protection predominate over factors that favor an independent contractor status.").

Consistent with our reasoning in *supra* Part IV.B.2, Plaintiff has plausibly pled the creation of an employment relationship in which St. James exercised control over the Plaintiff. Thus, Plaintiff is "an employee" who can state a cause of action for wrongful discharge. Therefore, Defendants' motion to dismiss Count 2 is denied**.**

## V. CONCLUSION

For the reasons set forth above, the motion to dismiss is **DENIED**. An appropriate order follows.

/s/ William J. Martini

_____
**WILLIAM J. MARTINI, U.S.D.J.**

**DATE: March 26, 2015**